*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*




## OPINION

No. 04-11-00079-CR

Thomas **AHRENS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR4260A
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:  Steven C. Hilbig, Justice

Sitting:  Karen Angelini, Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  December 28, 2011

AFFIRMED

Thomas Ahrens was convicted of murder and sentenced to forty-five years in prison. Ahrens appeals, contending there is insufficient evidence to corroborate the testimony of an accomplice and the evidence is legally insufficient to support the jury's verdict. We affirm the judgment.

**BACKGROUND**

Christopher Duncan, the victim, shared an apartment on the southeast side of San Antonio with Jason Woodward. Woodward testified that Duncan left their apartment at 11:30 p.m. on February 4, 2008, to buy beer. Woodward testified he called Duncan at 12:15 a.m. because he was concerned about Duncan's whereabouts. Duncan told Woodward that he had met some people and he was going to have drinks with them. At 12:45, Duncan called Woodward and said he was okay. Woodward became worried and called Duncan again at 12:57 a.m. Woodward testified that Duncan sounded anxious and said he would be home soon. Woodward never heard from Duncan again.

Woodward called Duncan's cell phone the next morning, but no one answered. Woodward later received a call from his bank and was informed that suspicious purchases were being made with the debit card for Woodward and Duncan's joint account. Woodward went to an online banking website and discovered the card had been used at several stores after Duncan's disappearance, including a Target. He went to Target with Duncan's mother and other relatives and viewed the store's surveillance video. Woodward testified that from viewing the tape he determined that the card was being used by an unknown man and woman. Using a photo obtained from Target, Woodward and the family members went to various homeless camps and businesses seeking information about the man and woman in the photograph. On February 8, 2008, an employee of a local store told Woodward that the woman in the photograph had been seen in a wooded area behind the shopping center. Woodward and others began searching the wooded area. They found Duncan's body covered by a tarp in a clearing in the woods that appeared to be a campsite used by homeless people. Woodward also told the jury Duncan had been homeless at one time and had a soft spot in his heart for homeless people. Woodward

recalled that Duncan would often buy food or cigarettes for homeless people if he encountered them outside a store.

A subsequent police investigation revealed that one of the purchases made with Duncan's debit card the evening of February 5, 2008, was at a Wal-Mart located near the murder scene. The surveillance video of the transaction was admitted into evidence. Witnesses testified the video depicted Ahrens and his female companion walking through the store and eventually leaving with various items purchased with Duncan's debit card. A receipt of the transaction, showing it occurred at 10:05 p.m., was also admitted.

Julia Valverde testified she worked at the same Wal-Mart in the sporting goods department. During the afternoon of February 4, 2008, she waited on a couple that purchased beer, a machete, a can of water repellent, and some sealer. She testified that the couple told her they were homeless and asked her if there was a secluded area near the store. A copy of the sales receipt introduced into evidence showed the UPC codes for each item. Valverde identified Ahrens as the male to whom she sold the machete. Because beer was being purchased, she requested identification. Valverde stated that she is required to enter the birthdate into the register in order to complete the sale of beer. The receipt contains the birthdate from the identification card — December 19, 1974. San Antonio Police Detective John Marfin testified that Ahrens's date of birth is December 19, 1974. Ruben Naranjo, also a Wal-Mart employee, testified he used the UPC code to determine the machete sold to Ahrens was the only machete sold in that store the month preceding Duncan's murder.

Saul Gonzales, a waiter at a Chili's restaurant located near the murder scene, testified he was working on February 5, 2008, and that he waited on a homeless couple that evening. He indicated it was unusual to have homeless people eat at the restaurant. He testified the couple

seemed very happy and both ordered steaks and a steak to-go. They also ordered margaritas with extra shots of liquor. Gonzales testified the couple paid with a credit card; however, other evidence established the card was actually Duncan's debit card. A copy of the receipt was introduced into evidence and reflects the time of the transaction as 9:28 p.m. Gonzales identified Ahrens from a photo array as the male he served that night.

David Rivera testified he was the loss prevention manager at a Target store located near the murder scene. At the request of the police, Rivera obtained surveillance tapes and a receipt relating to a sales transaction that took place at 7:52 p.m. on February 5, 2008. The video was played for the jury and depicts a male and female couple purchasing some clothing and other items. Rivera testified that the clothing purchased in the video appeared to be the clothing worn by the female in the surveillance photo taken at the Wal-Mart later that evening. The receipt reflects Duncan's debit card was used to make the purchases.

San Antonio Police Department Detective Tim Angel testified that during the murder investigation he learned fraudulent purchases were made with Duncan's debit card on February 5, 2008. He reviewed the surveillance videos from Wal-Mart and noticed the same couple bought several items using Duncan's debit card. In the video depicting the sale of the machete, he also saw the couple walk out of the store and down the footpath leading to the location where the body was found. He told the jury he was able to obtain a good picture of the couple from the videos, and he obtained a "John Doe" warrant charging each person with murder. Detective Angel testified that the investigation ultimately led him to interview Robert White, who was being held by authorities in Corpus Christi. White identified the couple as Ahrens and his girlfriend Kristi Tebo. Based on his statements to Detective Angel, White was charged with the murder of Duncan.

White testified at Ahrens's trial. White told the jury he met Ahrens and Tebo when the couple walked up to him while he was drinking beer near the intersection of Goliad Road and S.E. Military Drive in southeast San Antonio. White was homeless and living with his brother who was camped in some woods nearby. The couple asked if they could "chill" and drink beer with him. They later met Duncan and all decided to visit Ahrens's campsite. The group continued to drink at Ahrens's campsite and White became quite intoxicated. At some point, Duncan struck White in the nose. White was unable to explain why Duncan struck him other than to say that he might have said "something" to Duncan. White stated he then began to fight Duncan, and Duncan fell on Ahrens's tent where Tebo was sleeping. White hit and kicked Duncan several times while he was on the ground. White testified that when Duncan said he "was finished," White halted his attack. White testified that after he stopped kicking Duncan, Ahrens began to kick Duncan as Duncan lay on the collapsed tent. Tebo opened the tent and Ahrens told her to "throw" him the machete. White estimated that Ahrens struck Duncan twenty to thirty times with the machete and the attack lasted one to two minutes. After he stopped, Tebo used the machete to strike Duncan once, and stated "Well, are you going to hurry up and fucking die?" White testified he walked away from the campsite alone, but Ahrens and Tebo later caught up with him and they drank some more beer. The group left San Antonio a few days later and travelled to Corpus Christi. White admitted he pled guilty to the murder of Duncan but that he had not yet been sentenced. He explained that he would receive a sentence of not more than twenty-five years in prison in exchange for his testimony.

Dr. Randall Frost, the Bexar County Medical Examiner, testified about the results of the autopsy he conducted on Duncan. Dr. Frost noted numerous cuts on Duncan's body and stated they were caused by a heavy, sharp, bladed instrument similar to a machete. There was a single

wound to the neck that cut the trachea and the left vertebral artery and which would have been fatal by itself. However, it was Dr. Frost's opinion that the cause of death was "multiple incised chop and blunt force injuries, as well as stab wounds." He also testified that all of the wounds could have been made by the same weapon.

Catherine Haskins-Miller, a forensic scientist employed by the Bexar County Crime Laboratory, testified she examined evidence collected from the crime scene as well as DNA samples obtained from White, Tebo, Duncan, and Ahrens. She testified that Ahrens was not excluded as the DNA donor on at least two beer cans retrieved from the crime scene and the probability of another person having the same DNA profile as Ahrens was one in eighty-nine trillion. She also found DNA profiles of Tebo on various pieces of evidence from the crime scene.

The jury was instructed that it could find Ahrens guilty either as a principal or as a party acting in concert with White "and/or" Tebo. The charge also included an accomplice witness instruction as to White's testimony. The jury returned a guilty verdict.

## ACCOMPLICE TESTIMONY

Ahrens contends there is insufficient evidence to support White's accomplice testimony. An accomplice witness is a person who could be prosecuted for the same offense as the defendant or a lesser-included offense. *Blake v. State*, 971 S.W.2d 451, 454-55 (Tex. Crim. App. 1998). A person may not be convicted based on testimony of an accomplice unless there is other evidence, independent of the accomplice witness, that tends to connect the defendant to the crime. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West Supp. 2010); *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). Corroboration is not sufficient if it merely shows the commission of the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2010). "The

corroborative evidence, however, need not be sufficient in itself to establish guilt, nor must it directly link the accused to the commission of the offense." *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008), *cert. denied*, 129 S.Ct. 2075 (2009). Rather, the independent "'evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App.2009) (quoting *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)). The independent evidence tending to link the defendant to the crime is viewed in the light most favorable to the jury's verdict. *Brown*, 270 S.W.3d at 567.

The parties agree White was an accomplice; therefore, we must disregard his testimony and determine if there is sufficient evidence connecting Ahrens to the crime. Ahrens argues he was not sufficiently linked to the crime by the evidence. We disagree.

DNA evidence places Ahrens and Tebo at the crime scene. Although Ahrens correctly points out the forensic expert could not determine when the DNA was deposited, Ahrens overlooks the testimony from Valverde, the Wal-Mart clerk who sold the machete and beer to Ahrens the day before the murder. Valverde testified Ahrens and Tebo asked her if there was a secluded area near the store, suggesting they were looking for a place to camp. A rational jury could infer from this testimony that Ahrens had not yet established his camp in the woods, and the DNA was deposited during or near the time of the murder. Proof that a defendant was at the crime scene near the time of the crime may, when coupled with other suspicious circumstances, tend to connect the accused to the crime. *See Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Investigators found packaging material that came from a machete at the crime scene. Using the UPC code on the packaging, investigators purchased another machete from

Wal-Mart that matched the packaging. Dr. Frost testified the wounds inflicted upon Duncan could have been made by the demonstrative machete. Naranjo testified he searched the records at Wal-Mart for one month before the murder date and found no record of another machete being sold. Ahrens was identified using Duncan's debit card the evening of February 5, 2008. Woodward testified he last spoke to Duncan at 12:57 a.m. that day, and received no answer when he called later in the morning. From this evidence a reasonable jury could have inferred that the murder took place sometime during the morning hours on February 5, 2008, and Ahrens's possession of Duncan's debit card later that evening was some evidence that tended to connect him to the murder. *See Herron v. State*, 86 S.W.3d 621, 633 (Tex. Crim. App. 2002) (defendant's possession of stolen property properly considered as evidence tending to connect him to crime); *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (holding that possession of property taken in crime was some evidence that tended to connect defendant to crime). A rational jury could conclude that the evidence, independent of the accomplice's testimony, sufficiently tended to connect Ahrens to the murder.

## LEGAL SUFFICIENCY

Ahrens also contends the evidence is legally insufficient to support the jury's verdict. His argument focuses mainly on his contention that White's testimony was incredible and contradictory, and no rational jury could have believed it.

In a challenge to the sufficiency of the evidence, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the charged offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899, 912 (Tex. Crim. App. 2010). We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to

be given their testimony. *Id.* at 899. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The standard of review is the same for cases relying on either direct or circumstantial evidence. *Id.* "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of the incriminating circumstances is sufficient to support the conviction." *Id.* Because Ahrens was charged as both a principal and a party to the offense, we will review the evidence to determine whether it is legally sufficient under either theory. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("[W]hen the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories."). A person is guilty as a party to an offense if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid another to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011); *Hooper*, 214 S.W.3d at 13.

The evidence is clearly sufficient to support the jury's verdict that Ahrens caused Duncan's death. The determination of White's credibility was for the jury's sole determination, and by its verdict, the jury apparently found White's testimony credible despite any contradictions. Although White provides the only direct evidence that Ahrens struck Duncan with the machete, this evidence, coupled with the circumstantial evidence, including Ahrens's purchase of the machete just before the killing and his possession of the victim's debit card shortly after the killing, would permit a rational jury to determine beyond a reasonable doubt that Ahrens was responsible for the crime. Although the medical examiner testified that only one wound was definitely fatal, he stated that Duncan's death resulted from multiple "incised chop

and blunt force injuries." The evidence was sufficient to enable a rational jury determine that Ahrens was guilty as a principal.

The judgment of the trial court is affirmed.

Steven C. Hilbig, Justice

PUBLISH